UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PI TELECOM INFRASTRUCTURE,
LLC,

       Plaintiff,

v.                                    Case No. 3:14-cv-838-J-32MCR

CITY OF JACKSONVILLE, FL,

       Defendant.

_____

## O R D E R

    Plaintiff PI Telecom Infrastructure, LLC challenges Defendant City of Jacksonville, Florida's denial of its application to construct a wireless communications facility (more commonly known as a cell tower) as violative of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 151 et seq. The record here is fixed, and the facts are not substantially in dispute. The parties have fully briefed cross-motions for summary judgment. The Court heard oral argument on April 22, 2015, the record of which is incorporated herein. (See Doc. 23.)

## I.   BACKGROUND

    PI Telecom sites, constructs, and operates cell towers for telecommunications carriers in Florida. (Compl. ¶ 1, Doc. 1.) PI Telecom has proposed constructing a 150-foot camouflaged unipole[1] cell tower at a location in the San Marco neighborhood of

---

    [1] A unipole is a single, utility-pole-like design with the antennas internally mounted. (PC REC_0018 at 117.) In the design proposed here, the antennas are hidden behind a visually-opaque but radio-transparent screen that carries the width of the

Jacksonville, Florida approximately 150 feet north of River Oaks Road, in a railroad right-of-way owned by Florida East Coast Railway, roughly between Fieldston Lane and Summerall Avenue ("the proposed site"). (PC REC_0004, 67.[2]) The site is marked by a circle at the center of the satellite map below:[3]



---

lower monopole steel section all the way to the top of the pole. (PC REC_0026 at 149.)

   [2] The parties have jointly filed the agreed-upon record (Docs. 10-12), to which the Court will generally refer by bates number, except for the meeting transcript, to which the Court will refer by both bates number and transcript page number.

   [3] Also on the map are the locations of a preexisting cell tower (marked in green) and sites where PI Telecom tested sight views of the proposed tower (marked in red and yellow), as discussed further below. (PC REC_0075-84.) The image above is a brightened version of a scanned copy of the satellite map submitted by the parties.

(PC REC_0075.) The proposed site is zoned Industrial Light, with a Light Industrial land use category. (PC REC_0004.) A Jacksonville Electric Authority facility is immediately east of the proposed site. (PC REC_0006.) Immediately north of that, and north-northeast of the proposed site, is Jackson Square, a presently-undeveloped, mixed-use commercial and multi-family residential Planned Unit Development ("PUD").[4] (PC REC_0005-6.) Further to the east is a commercial corridor along Philips Highway. (See PC REC_0005.) On the south side of River Oaks Road from the proposed site, along the east side of the railroad tracks, is additional property zoned Industrial Light. (PC REC_0006.) Approximately 145 feet west of the proposed site is Alexandria Oaks Park, a large, open recreational space with a line of mature trees along its boundary with the right-of-way. (PC REC_0005-6.) Residences line each of the other three sides of the park and spread out into the neighborhood from there. (Id.)

## A.    The Jacksonville Tower Ordinance

On April 1, 2014, PI Telecom submitted its application to build the tower with the Jacksonville Planning and Development Department ("Department"). (PC REC_0067.) Sections 656.1501-.1517 of the Jacksonville Ordinance Code (the "Tower Ordinance") set out the applicable regulations for the location, design, and operation of cell towers within the City. The stated goals of the regulations include "[p]rotecting

---

[4] A zoning map of the area of the proposed site can be found at PC REC_0011. There was some confusion during the Planning Commission hearing as to whether the site fell within the Jackson Square PUD. (PC REC_0026 at 151-52.) Planning and Development Department staff explained, though, that while the map shows the PUD extending to the center of the right-of-way, it actually extends only to the eastern boundary of the right-of-way. (PC REC_0027 at 153-54.) The City does not contend in its brief that the proposed site is within the PUD. (Doc. 15 at 2.)

3

the natural features and aesthetic character of the City . . . with special attention to residential neighborhoods, public parks, transportation view corridors, historic districts, historic landmarks, and environmentally sensitive lands" and "[m]inimizing the adverse visual and aesthetic impact" of cell towers while "accommodating the growing demand for wireless communication services . . . ." Jacksonville Ordinance Code ("JOC") § 656.1501(b)-(c). To ensure that these purposes are not frustrated, the City employs a three-part application review process.

Any telecommunications company wishing to construct a new cell tower must submit an application to the City. JOC § 656.1504. Initially, a Planning Coordinator reviews the application for completeness. Id. If complete, the application is forwarded to the Department, which prepares a staff report recommending denial, approval, or approval with conditions. In the case of "Track II Towers" such as the one proposed by PI Telecom,[5] the Planning Commission (the "Commission") must hold a public hearing and make a final determination on the application. JOC § 656.1506(d). The Commission is the ultimate decision-maker on tower applications. JOC § 656.1506(e).

Section 656.1506 on Track II Towers reads in pertinent part:

(a) *Application and review*. Applications to construct a camouflaged tower not satisfying the criteria set forth in Section 656.1505, Ordinance Code, or low impact/stealth tower shall be assigned for processing on a "Track II" schedule. Within 15 days of notification

_____

[5] The Tower Ordinance classifies cell towers as Track I, II, or III based on the design and location of the proposed tower. JOC §§ 656.1505-.1507. Each designation carries its own application requirements. Id. PI Telecom actually submitted its application on the Track I application form (see PC REC_0067-69), but the Department, the Commission, and the parties here have all treated the application as a Track II tower. (See PC REC_0002, 4; Doc. 14 at 5-7; Doc. 15 at 3-4, 17-18.)

from the Coordinator that the application is complete, a Track II application shall be scheduled for review at the next regularly scheduled meeting of the Commission. The Commission shall approve, deny, or conditionally approve the application where it finds that the proposed tower (1) complies with the tower siting and design standards and performance standards of this Subpart; and (2) is compatible with the existing contiguous uses or zoning and compatible with the general character and aesthetics of the surrounding neighborhood or area, considering (a) the design and height of the wireless communication tower; and (b) the potential adverse impact upon any environmentally sensitive lands, historic districts or historic landmarks, public parks or transportation view corridors.

(b)   *Camouflaged towers; Siting and Design Requirements.* Except as set forth in Section 656.1514, Ordinance Code, Track II camouflaged towers shall be permitted in all zoning districts, including Planned Unit Development Districts, and shall meet the compatibility requirements set forth in subsection (a) above and shall be subject to the following siting and design requirements:

(1)   *Height.* Track II camouflaged towers shall not be subject to a maximum height requirement, so long as the proposed tower is architecturally and aesthetically compatible with the surrounding community.

(2)   *Setbacks.* Regardless of the zoning district in which a camouflaged tower is proposed to be constructed, the tower shall be set back a distance of at least 100 percent of the tower height from the nearest residential lot line of any single family residence or single family residentially-zoned property, including residential PUD districts and properties with a single-family residential component in a mixed-use PUD district, or AGR IV land use category; provided, however, that this setback shall not be required where legal title to the nearest residential parcel is held by the owner of the tower site. In the event that the proposed tower is to be located within a mixed use Planned Unit Development (PUD), the minimum distance set forth herein shall be measured from the nearest residential development. Camouflaged towers shall also be set back a minimum distance of 50 feet from any transportation view corridor or environmentally sensitive lands; provided, however, that the set back from the transportation view corridor shall not apply where the camouflaged tower is designed to resemble a utility or light pole.

(3)   *Collocation.* Any camouflaged tower in excess of 100 feet in

> height shall be designed to accommodate antennas for at least two separate wireless communication service providers.

JOC § 656.1506(a)-(b).

Thus, pursuant to section 656.1506, a successful Track II application requires the satisfaction of two criteria, one objective (compliance with siting, design and performance standards) and one subjective (compatibility with existing contiguous uses and zoning and with the general character and aesthetics of the surrounding neighborhood or area). JOC § 656.1506(a). In making its subjective determination regarding compatibility, the Commission is instructed to consider both the design and height of the proposed tower and the potential adverse impact upon areas like historic districts and parks. Id. If both the objective and subjective elements are satisfied, the Commission "shall approve" the application. Id. If not, the Commission is vested with the authority to either conditionally approve or deny the application. Id.

### B.    PI Telecom's Application

Among other things, PI Telecom's application packet included statements describing the proposed site and the need of carrier AT&T Mobility, Inc. for a tower at that location, coverage maps for before and after installation of the proposed tower, maps of the "search ring," the satellite map reproduced above, and a series of photo simulations of the proposed tower from the selected locations near the proposed site marked on the above satellite map. (PC REC_0071-72, 75-89.)

The letter of need from AT&T explains that it requested PI Telecom build a tower at the proposed site to remedy the area of in-building coverage weakness

depicted as the largest area in yellow in the coverage map below:



(PC REC_0085; see PC REC_0072, PC REC_0017 at 114.) AT&T's radio frequency ("RF") system design engineer identified this area after reviewing coverage in Jacksonville, analyzing existing antenna sites, conducting site visits, and performing computer modeling of coverage. (PC REC_0072.) Based on this analysis, AT&T concluded that "the existing coverage levels do not adequately support the usage demands of AT&T customers in this area, in terms of placing calls and using advanced data devices such as smartphones, tablets[,] etc." (Id.)

AT&T used its analysis to develop a zone, or "search ring," within which a tower

would need to be located to meet AT&T's coverage objective of "improv[ing] coverage/capacity to homes, businesses and the surrounding area that currently has weak or no service conditions" and "provid[ing] 4G LTE Gold level wireless services and features" in the area. (PC REC_0071-72.) The center of the search ring represents the best location for a tower in terms of coverage, which in this case actually falls within Alexandria Oaks Park. (PC REC_0088; see PC REC_0030 at 168.) But the search ring here allows PI Telecom to place a tower anywhere within a 0.252-mile radius from the center without needing further approval from AT&T. (PC REC_0071, 88; see PC REC_0030 at 165-68.) The proposed site is approximately 0.16 miles from the center of the search ring. (PC REC_0071.) AT&T propagation modeling indicates installation of a tower at the proposed site would eliminate much, but not all, of the service weakness in the area shaded in yellow in the coverage map above and would result in "much improved service that will benefit residents, businesses, first responders and E-911 accuracy." (PC REC_0072, 86.) PI Telecom investigated locating its antennas on an existing monopole cell tower 0.32 miles from the center of the search ring near the intersection of St. Augustine Road and Westmont Street, but that tower was unsuitable because it was both outside the search ring and at full capacity with other wireless carriers. (PC REC_0071.)

PI Telecom's consultant also prepared for the application photo simulations of what the proposed tower might look like from the various positions all around the proposed site marked on the satellite map reproduced earlier. (PC REC_0075-89.) To do so, a surveyor performed a test positioning a weather balloon at the approximate

height and position of the proposed tower. (PC REC_0084.) Photographs were taken at each location where the balloon could be seen.[6] (PC REC_0083.) The photographs were then uploaded to a computer, and, employing photogrammetric principles, a simulated tower was placed within the photograph. (Id.) Of the ten locations tested, some part of the tower could be seen at seven locations. (PC REC_0075.) The proposed tower is most visible from View "I", a view looking back toward the proposed site from 993 feet to the northwest, along the north edge of Alexandria Oaks Park. (PC REC_0081; see PC REC_0018 at 118.) PI Telecom did not submit as part of its application any simulations of the view from a location within Alexandria Oaks Park.[7]

### C.    The Department Staff Reports

The Department reviewed PI Telecom's application and first issued a staff report on it on May 8, 2014, recommending the application be approved. (PC REC_0103-09.) The staff determined that the application did not comply with the landscaping requirements of the Zoning Code, but that if PI Telecom's request for a waiver of those requirements were to be granted, the application would meet all siting,

---

[6] Each location tested by the surveyor is marked with a letter on the satellite map. (PC REC_0075.) The balloon was visible at those locations marked in yellow and not visible at those marked in red. (Id.) An existing cell tower is marked in green. (Id.)

[7] Though not clear in the written record, the parties explained at the April 22, 2015 hearing that PI Telecom did provide the Department a photo simulation of the tower as seen from an unknown location in Alexandria Oaks Park. (See PC REC_0049.) This simulation was not part of PI Telecom's application packet as it appears in the record, but is included along with correspondence to the Department from the developer of the Jackson Square PUD. (PC REC_0047.) There is no indication in the record where in the park the original photo was taken, whether it was part of the balloon test, or how the tower simulation was then created.

design, and performance standards. (PC REC_0104.) PI Telecom apparently later modified the landscaping so as to not need a waiver. (PC REC-0014 at 104; PC REC_0034 at 183.) The Department then issued a revised report dated June 19, 2014 that found the application compliant with the landscaping requirements. (PC REC_0004-11.) This second report was otherwise identical to the initial report. (Compare id. with PC REC_0103-09.)

The Department reports classify the proposed tower as a Track II tower "utilizing a camouflaged design." (PC REC_0004-5.) As such, the Department evaluated the application based on the two objective and subjective criteria set forth in section 656.1506(a). The Department determined that the proposed tower complies with the objective siting and design requirements by exceeding the minimum distance from wetlands, environmentally sensitive lands, parks, and public right-of-ways, and by "meet[ing] the required setback from residentially zoned land and the required landscaping." (PC REC_0005.) The Department also concluded that the design for the proposed tower meets the section 656.1506(b)(3) performance standard that camouflaged Track II towers accommodate antennas for at least two carriers by allowing for a total of five carriers. (Id.)

As for the subjective criteria, the Department believed that the proposed tower would be "compatible with the existing contiguous uses or zoning and compatible with the general character and aesthetics of the surrounding neighborhood or areas" after considering its design, height, and potential adverse impact on "environmentally sensitive lands, historic districts or historic landmarks, public parks or transportation

view corridors." (PC REC_0005-6.) Specifically, the staff felt the camouflaged unipole design was the most compatible design for the area, noting that the photo simulations showed "no direct views of the tower" from the residential areas to the west of the proposed site and that the tower blended in with utility and light poles when viewed from the east along Philips Highway. (PC REC_0005.) As for Alexandria Oaks Park, the staff noted that "[t]here is a row of mature existing trees along the property line which prevent direct views of the tower [from] the park trail." (PC REC_0005-6.) The Department therefore concluded that "[t]he camouflaged unipole tower design will be consistent and compatible with the area" and recommended that the application be approved. (PC REC_0006.)

### D.   The June 19, 2014 Commission Meeting

PI Telecom's application went before the Commission for public hearing on June 19, 2014. (PC REC_0013 at 1.) Chairman Robbins began by disclosing letters objecting to the proposal that he had received from a resident of the San Marco neighborhood and from the San Marco Preservation Society, as well as correspondence Steve Cissel, the developer of the Jackson Square PUD, had sent to Department staff. (PC REC_0015 at 105.) Commissioners Day, King, and Hagan each disclosed that Cissel had spoken with them regarding his objections to the proposal and his view of its impact on his development. (Id. at 105-107.) Commissioner Dietrich disclosed she had communications with Wyman Duggan, a representative of the Jackson Square PUD. (Id. at 107.)

Attorney Gary Hunter began the presentation for PI Telecom. Hunter

highlighted the Department's objective role in the process and its recommendation that the application be approved, and stressed that the proposal met the criteria for approval as a Track II tower. (PC REC_0015 at 108; PC REC_0016 at 109.) He closed his brief initial presentation by noting the removal of the landscaping issue and by requesting the right to examine any opposing expert testimony that might be presented (none was). (PC REC_00016 at 109-10.)

Gerald Muldowney, PI Telecom's consultant on the application, was next sworn in and presented the bulk of the case in favor of the application. (Id. at 111-12.) Muldowney represented that he is a licensed engineer and surveyor with forty-one years of survey and engineer experience, twenty-one of which have been in the telecommunications industry. (Id. at 112.) After presenting his credentials, Muldowney discussed the purposes of the Tower Ordinance and the Act and explained that "one of the primary objectives" of the proposed tower "is to try to get in-building service" to the area to the west of the proposed site (the area depicted in yellow in the coverage map reproduced earlier). (PC REC_0017 at 113-14.) He reiterated the Department's finding that the proposal meets the objective siting and performance standards, but recognized that compatibility would be the sticking point. (Id. at 115-16.) Muldowney opined that the proposed site "represents the ideal situation for providing coverage" into a residential area since the site is zoned industrial and reaches into the residential area from the fringe, rather than from the middle. (PC REC_0017 at 116; PC REC_0018 at 117.) He represented that the proposed design of the tower is one preferred by the Department and represents "the latest in camouflage

technology" that conceals the antennas and cables in an effort to lessen the tower's visual impact in areas of particular aesthetic concern or sensitivity. (PC REC_0018 at 117.) Muldowney expressed an openness to using a camouflaged pine tree design, but suggested such a design would have a greater visual impact than the proposed unipole. (Id. at 118.)

Muldowney then discussed the balloon test and photo simulations created by his company to depict the visual impact of the tower. Recognizing that the tower would be visible from Alexandria Oaks Park, he opined that its resemblance to a power pole, though much taller than one, makes it "as slight and benign in nature visually as it possibly can be." (Id. at 119.) As for the Jackson Square PUD, Muldowney suggested the development would be well-served by the tower's cell coverage while an estimate of only 0.5% of its dwelling units would have a direct view of the tower and any view of the tower from elsewhere would be broken up by the four-story development itself. (Id. at 119-20.) He also noted that the railroad is an active freight line, so a cell tower in the adjacent right-of-way would present a much less intensive use. (Id.) Muldowney closed his initial presentation by reiterating his belief that the proposal is the most compatible proposal possible within the search ring and by opining that denial would be akin to simply banning wireless service from single-family residential areas. (PC REC_0019 at 121.)

After Muldowney's initial presentation, the Chairman opened the meeting to the public. Catherine Williams, a resident of the residential area a few blocks west of the proposed site, was sworn in and spoke in opposition to the proposal, suggesting an

alternative location roughly a half a mile south along the right-of-way, near St. Augustine Road. (Id. at 123-24.) She described the St. Augustine location as having more commercial development in the area and a greater buffer between the residential area and a cell tower than the current proposed site. (Id.) She questioned whether PI Telecom had adequately investigated that option. (Id.)

Next to speak, unsworn, was Wyman Duggan on behalf of the Jackson Square PUD. He argued that the proposed tower is not a camouflaged tower under the Tower Ordinance, but a low impact/stealth tower and would not comply with the different setback and height restrictions. (PC REC_0020 at 125-27.) He contended that, even classified as a camouflaged tower, the proposed tower must be setback from the nearest residential use by a distance equal to 100% of its height, or 150 feet, and Jackson Square is only 100 feet from the proposed site. (Id. at 126-28.) Duggan also opined that the proposal would be incompatible with the City's long-range plan for a future commuter rail station for Jackson Square. (PC REC_0021 at 129.) He submitted his own photo simulations of the proposed tower from the view of Jackson Square and of Alexandria Oaks Park. (Id. at 130.) Duggan concluded his remarks by proposing an alternate site on an unopened city road called Garland Street to the south of the proposed site that would still be within the search ring and, in his view, would not as severely impact the park and Jackson Square. (Id. at 130-31.)

City Councilmember Lori Boyer spoke next, also unsworn. The proposed site falls partially in her district and partially in the district of Councilmember Warren Jones, who had submitted a letter in opposition. (PC REC_0063.) Councilmember

Boyer provided some history of Alexandria Oaks Park and urged the Commission to focus on the proposed tower's impact on the park and on historic districts and landmarks. (Id. at 131-32.) She represented that, while the park and the homes around it have not been designated historic sites, they are eligible for such a designation. (PC REC_0022 at 133.) Councilmember Boyer noted the particular visual impact of the tower on the homes surrounding the park that back directly onto the park and use the park as their backyard vistas. (Id.) She supported consideration of an alternative site to the south due to the potentially lower impact. (Id. at 134.)

The Commission then gave Hunter and Muldowney the chance to respond to the public comments made earlier. Hunter responded first. He took issue with Duggan's photo simulations, suggesting there was no foundation as to how they were prepared. (PC REC_0022 at 135.) He also repeated that the proposed tower does qualify as a camouflaged pole under the Tower Ordinance and had been treated as such by the Department staff. (Id. at 135-36.) He rebutted the contentions that the proposed site was within the PUD zone of Jackson Square and did not meet setback requirements, since the 100% of tower height setback requirement for camouflaged towers is measured to the nearest lot line for single-family residential property, which Jackson Square is not. (Id. at 136; PC REC_0023 at 137.) Hunter downplayed Councilmember Boyer's comments about historic designations since neither the park nor the area around it have been designated historic. (PC REC_0023 at 137.) He urged the Commission to defer to the professional opinion of the Department staff and not to succumb to a general dislike for cell towers since PI Telecom had done everything

possible to minimize the impact of the tower. (Id. at 138-39.)

Muldowney began his response to the public comments by noting technical flaws in Duggan's photo simulations that Muldowney felt made them inaccurate representations of the tower. (Id. at 140.) He also repeated that the tower is a camouflaged tower, that the site is not within the PUD, and that it meets the setback requirements as determined in the staff report. (PC REC_0024 at 141-43.) Muldowney also addressed the possibility of moving to a site further south, noting that any site outside the search ring would require approval from AT&T and that, with no park to serve as a buffer, the residential properties further south would be even closer to the railroad right-of-way. (PC REC_0024 at 143-44.) Finally, Muldowney noted that any potential commuter rail station at Jackson is only in the conceptual stage. (Id. at 144.)

With no further public comments, Chairman Robbins closed the public portion of the meeting, and Commissioner Hagan made a motion for denial of the application, seconded by Commissioner King. (PC REC_0025 at 145.) The Commission then proceeded to its own discussion of the application, with questions for the city attorney, Folks Huxford of the Department staff, Muldowney, and Duggan. The discussion began with an extended dialogue between the commissioners, the city attorney, and Huxford as to whether the proposed tower was a camouflaged or low impact/stealth tower, the different setback requirements, and the site's zoning. (Id. at 145-48; PC REC_0026 at 149-52; PC REC_0027 at 153-54.)

After this dialogue, Commissioner King registered her comments on the application. She disagreed with the staff's classification of the proposed tower as a

camouflaged tower. (<u>Id.</u> at 155.) She also expressed "significant concerns about its impact on a section of the city that has been surveyed and deemed eligible as a historic district and a park that has been deemed eligible to be a historic landmark," indicating that the fact that they had not been designated historic does not eliminate that factor from her consideration. (<u>Id.</u> at 155-56.) She indicated she was "strongly opposed to this application" due to the impact on "viewsheds from historic properties." (<u>Id.</u> at 156.) Commissioner King worried about "working at cross purposes" with the City's plan for a future commuter rail station, even if no agreements were yet in place. (<u>Id.</u>)

Commissioner Diettrich then inquired of Muldowney as to locating on the existing cell tower to the south of the proposed site or considering an alternative site to the south. (PC REC_0028 at 157.) Muldowney responded that the existing tower would not work and had already been ruled out by AT&T's RF engineer because it is outside of the search ring, already at carrier capacity, and too low to meet AT&T's coverage objectives for the area. (<u>Id.</u> at 157-60; PC REC_0029 at 161.)

As for the Garland Street location to the south, Muldowney acknowledged that PI Telecom had not been aware of it until it was raised earlier in the meeting, but he was concerned whether the City would be able to lease property in a public right-of-way. (PC REC_0029 at 161-62.) He also initially thought Garland Street was outside the search ring, but might still meet AT&T's coverage objective. (<u>Id.</u> at 162.) After the city attorney confirmed that the City regularly does lease its rights-of-way for private utilities, Muldowney expressed some concern that a tower might not physically fit at that location. (<u>Id.</u> at 162-63.) On a related follow-up question from Commissioner

17

Diettrich, Duggan noted that the Garland Street location is within the 0.252-mile search ring and offered his view that Garland Street was unlikely to ever be developed as a public street. (Id. at 164.)

Muldowney then responded to a question from Commissioner Hagan as to how the search ring had been developed in this case. (PC REC_0030 at 165-66.) Muldowney also stated that a carrier like AT&T would approach PI Telecom knowing that PI Telecom has a master agreement with Florida East Coast Railway throughout the state so PI Telecom could put a tower in the right-of-way as long as there is a spot within the search ring. (Id. at 167-68.) Thus, PI Telecom did not look at the Garland Street location because, as a land owner, it looks for compatible locations on its own land that meet the performance standards. (Id. at 168.) Muldowney acknowledged that the Garland Street location is within the search ring, so he would not need further AT&T approval to build there, though the location is somewhat further from the center of the search ring. (Id.) As he put it, "the problem is [the Garland Street location] is not property owned or controlled by us." (Id.; PC REC_0031 at 169.) He stated that PI Telecom had been asked to build a tower on its own property, so it tried to design one that would work there. (PC REC_0031 at 169.)

Commissioner Hagan closed with comments disagreeing with the classification of the tower as camouflaged and taking issue with both its setback from Jackson Square and general compatibility with the area. (Id. at 169-70.) Commissioner Hagan supported an application to build the tower at the Garland Street location. (Id. at 170.)

In his brief comments, Commissioner Hill stated, "my opinion is that it just has

a negative environmental impact on this particular neighborhood. And I am familiar with the neighborhood, and I just feel that it's just not compatible, and I think they could look at a different location that would be more compatible." (<u>Id.</u>)

Commissioner Day had additional questions for Huxford and the city attorney about the proposed site's zoning and the applicable setback requirements for camouflaged towers and low impact/stealth towers. (<u>Id.</u> at 172; PC REC_0032 at 173-76; PC REC_0033 at 177-78; PC REC_0034 at 181-83.) Commissioner Day stated that his main concern was the proposed tower's compatibility with the surrounding area and the public park, noting that PI Telecom's photo simulation View I from outside Alexandria Oaks Park showed the tower visible, which he viewed as suggesting the impact of the tower from the park itself would be "more substantial." (PC REC_0033 at 179-80.) Commissioner Day stated that, setting aside the tower's classification and zoning, "I still don't think it fits in the general character or aesthetics of that public park. Not the design standards, but just the compatibility (inaudible) of that park. So that's where I sort of keep coming down on." (<u>Id.</u> at 180.)

Chairman Robbins spoke last on the substance of the application. He expressed appreciation for Muldowney's efforts on the landscaping issue and his frankness in acknowledging that the Garland Street location falls within the search ring. (PC REC_0034 at 183.) But the Chairman identified his main focus as "the general character and aesthetics of the surrounding area," noting that "there are significant landmark properties" in the area, even if the San Marco neighborhood itself had not been designated a historic district. (<u>Id.</u>) He indicated concern about the tower's impact

on the Jackson Square PUD and the area around it, which are "the next hot spot" and "clearly on the move." (<u>Id.</u> at 184.) The Chairman suggested that, regardless of whether the tower were classified as camouflaged or low impact/stealth, it would still be "a big stick in the air." (<u>Id.</u>) In his view, the tower would have an impact on areas of Alexandria Oaks Park, a "landmark park" he described as "an active location" with a "vast open field" without a lot of tree canopy to hide the tower. (<u>Id.</u>) He summarized his position as follows:

> So my support of the current motion to deny is based on the impact to the area PUD, it's not just Jackson Square but the other works that are going on in the area, the fact that there is a viable alternative within the search ring, and the fact that the compatibility with the Alexandria Oaks Park does not meet this commissioner's view of being compatible.

(PC REC_0035 at 185.)

After some brief comments about the letter from City Councilmember Jones, the Chairman brought the motion to deny the application to a vote. (<u>Id.</u> at 185-86.) The motion passed unanimously, six to zero, and the application was denied. (<u>Id.</u>)

**E.    The Commission's Order**

The same day, June 19, 2014, the Commission issued a written order denying the application.[8] (PC REC_0001.) The order attaches a copy of the Department report and states that it "adopts and incorporates herein the findings and recommendations" of the report (though presumably not its final recommendation of approval of the application). (<u>Id.</u>) The main body of the order provides:

1.    The applicant has complied with all of the application

---

[8] The order constitutes a final action of the City. JOC § 656.1506(d)(6); <u>see</u> <u>Preferred Sites, LLC v. Troup Cnty.</u>, 296 F.3d 1210, 1217 (11th Cir. 2002).

requirements set forth in Section 656.1508, *Ordinance Code*.

2.      That the land to which this application is granted is owned by Florida East Coast Railway, LLC. A copy of the legal description of the subject property is attached as part of **Exhibit "A"** and incorporated by reference herein.

3.      The proposed tower does not comply with the tower siting and design standards and performance standards of Chapter 656, Part 15, Subpart A, *Ordinance Code*.

4.      The proposed tower design is not compatible with the existing contiguous uses, or zoning and is not compatible with the general character and aesthetics of the surrounding neighborhood, or area.

5.      The application for Track II Wireless Communication Tower CTW-14-04 is hereby **DENIED**.

(Id.) A transcript of the Commission meeting was completed six days later, on June 25, 2014. (PC REC_0036 at 193.)

## F.      The Lawsuit

On July 21, 2014, PI Telecom filed suit under the Act, alleging that substantial evidence shows that the Commission's decision has the effect of "prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II), that the Tower Ordinance itself has the same prohibitive effect, and that the Commission's decision was not supported by substantial evidence contained in a written record as required by 47 U.S.C. § 332(c)(7)(B)(iii). (Doc. 1, ¶¶ 44-60.) PI Telecom seeks both a declaratory judgment and a permanent mandatory injunction requiring the City to grant its application and any other required permits. (Id. at 20-21.) The City denies the operative allegations in the complaint. (Answer, Doc. 6.) As the record before this Court is fixed and the facts are not in significant dispute, the

parties have agreed that this case is appropriate for adjudication on cross-motions for summary judgment. (Joint Planning Meeting Report ¶ 3, Doc. 8.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether to grant summary judgment, the Court must view the evidence and inferences drawn from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor." T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988); WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988)). "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## III.   ANALYSIS

### A.   The Federal Telecommunications Act of 1996

Congress enacted the Act to "promote competition and higher quality in American telecommunications services and 'to encourage the rapid deployment of new telecommunications technologies.'" Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 761 (11th Cir. 2005) (quoting City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005)). "With respect to the construction of

telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network." <u>Preferred Sites</u>, 296 F.3d at 1214. Even so, "Congress also acknowledged 'there are legitimate State and local concerns involved in regulating the siting of such facilities,'" <u>id.</u> (quoting H.R. Rep. No. 104-204, at 94-95 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61), and drafted the Act so as to "'preserve[ ] the authority of State and local governments over zoning and land use matters except in . . . limited circumstances,'" <u>id.</u> (quoting H.R. Rep. No. 104-458, at 207-08 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 222).

The Act was therefore designed to "strike a balance between 'two competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" <u>Omnipoint Commc'ns, Inc. v. City of White Plains</u>, 430 F.3d 529, 531 (2d Cir. 2005) (quoting <u>Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc.</u>, 173 F.3d 9, 13 (1st Cir. 1999)). Thus, while local authorities retain the authority to regulate the placement and construction of towers, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities *shall be in writing and supported by substantial evidence contained in a written record*." 47 U.S.C. § 332(c)(7)(B)(iii) (emphasis added). The Act also provides that local cell tower regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Though the Eleventh Circuit has not

yet addressed the issue, other circuits have held that "a locality can run afoul of the [Act]'s 'effective prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage." Sprint PCS Assets, LLC v. City of Palos Verdes Estates, 583 F.3d 716, 726 (9th Cir. 2009) (citation and quotation omitted); see also APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler County of Pa., 196 F.3d 469, 480 (3d Cir. 1999); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999).

### B.     The "In Writing" Requirement (Count III of the Complaint)

PI Telecom's motion contends that the City's short June 19, 2014 order denying the application does not satisfy the Act's requirement that any denial be "in writing" and "supported by substantial evidence contained in a written record." (Doc. 14 at 21-24.) Using a test for the "in writing" requirement that at least one court in the District had employed before, PI Telecom argues that that the City's order does not sufficiently explain what siting, design, or performance standards the proposed tower fails to meet or its conclusion that the proposed tower is not compatible with the general character and aesthetics of the surrounding area. (Id. at 23); see T-Mobile S., LLC, 564 F. Supp. 2d at 1344-45.

In its motion, the City contends that its order contains the same level of specificity that Judge Moore found sufficient in T-Mobile South. (Doc. 15 at 25-26.) The reasons for the conclusions in the order are then adequately stated and supported in the record. (Id. at 26.)

In its reply, PI Telecom notes that the City's denial order in T-Mobile South referenced a written Department staff report and recommendations that lined up with

the Commission's decision, whereas the staff report here recommended approval, but the Commission denied the application. (Doc. 16 at 7.) PI Telecom also finds the reasons for denial expressed by the commissioners during the meeting to be jumbled, diverse, and without objective factual support, all of which PI Telecom believes further support the need for a more detailed written decision. (Id. at 8.)

On January 14, 2015, after initial briefing on the cross-motions for summary judgment was complete, the U.S. Supreme Court issued an opinion in T-Mobile South, LLC v. City of Roswell, Georgia (*Roswell III*), 135 S. Ct. 808 (2015) elaborating on the "in writing" requirement under the Act. This Court asked the parties to supplement their briefing to address the impact of Roswell III on this case. (Jan. 27, 2015 Order, Doc. 19.)

PI Telecom suggests in its supplemental brief that the Court consider this issue only as an alternative to ruling in PI Telecom's favor on its claim that the City's decision was made without substantial evidence. (PI Telecom's Suppl. Memo. 1, 7, Doc. 20.) But should the Court reach the issue, PI Telecom contends, the transcript of the Commission meeting does not provide "sufficiently clear" reasons for denial and was not provided as promptly as required by the Supreme Court in Roswell III. (Id. at 7.)

The City argues that Roswell III confirms that it satisfied the writing requirement, particularly since the transcript of the Commission meeting was produced just six days after the meeting. (Doc. 21 at 3-4.) And, the City argues, even if six days is not soon enough under Roswell III, it was not so long as to prejudice either PI Telecom's decision to file suit or this Court's review such that reversal of the

City's decision would be appropriate for this violation alone. (Id. at 6-7.)

### 1. **Roswell I**

Roswell reached the Supreme Court by way of the Northern District of Georgia and the Eleventh Circuit. Finding no authority on the issue from the Eleventh Circuit, the district court had employed what was then the majority test for determining whether a municipality had satisfied the "in writing" requirement: "a written denial 'must (1) be separate from the written record; (2) describe the reasons for the denial; and (3) contain a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons.'" T-Mobile S., LLC v. City of Roswell, Ga. (*Roswell I*), No. 1:10-CV-1464-AT, 2012 WL 10842487, at *4 (N.D. Ga. Mar. 27, 2012) (quoting New Par v. City of Saginaw, 301 F.3d 390 (6th Cir. 2002)); see T-Mobile S., LLC, 564 F. Supp. 2d at 1344-45 (adopting "the sensible position outlined by the New Par court"). The district court concluded that defendant City of Roswell's summary denial letter, combined with the minutes and transcript of the city council meeting on the application, failed this test. Roswell I, 2012 WL 10842487 at * 7. The district court therefore granted summary judgment for the plaintiff T-Mobile and ordered the city to grant the plaintiff's application.

### 2. **Milton**

While the initial Roswell appeal was pending, the Eleventh Circuit addressed the "in writing" requirement for the first time, siding with the minority of circuits at the time. In T-Mobile South, LLC v. City of Milton, Georgia, the Eleventh Circuit rejected the argument that the Act's requirement that any denial be "in writing and

supported by substantial evidence contained in a written record" means that the denial decision must be in a writing separate from the record. 728 F.3d 1274, 1283 (2013). The court agreed that the language of the Act means *some writing* must contain the reasons for denial so that a court can evaluate whether the decision is supported by substantial evidence. Id. "What is neither expressed nor implied [in the Act], however, is any requirement that the reasons for a denial must be stated in the [denial] letter or some other document that announces the decision, if there is a separate document doing that, or any prohibition against having the reasons stated only in the hearing transcript or minutes." Id. The Eleventh Circuit declined "to take a more pragmatic, policy-based approach" adopted in the majority of circuits (and followed by the district court in Roswell I). Id. at 1284. Instead, the court held that:

> [T]o the extent that the decision must contain grounds or reasons or explanations, it is sufficient if those are contained in a different written document or documents that the applicant is given or has access to. All of the written documents should be considered collectively in deciding if the decision, whatever it must include, is in writing.

Id. at 1285. The defendant City of Milton had sent three letters unambiguously stating its decision on the plaintiff T-Mobile South, LLC's application. Id. at 1282. The reasons for the city's decision could then be found in the 181 pages of hearing transcripts T-Mobile had arranged and paid for and in the sixty-five page detailed minutes the City of Milton provided. Id. Without deciding whether anything less or different would suffice, the court concluded that access to all of these documents pre-suit was enough to meet the "in writing" requirement of § 332(c)(7)(B)(iii). Id. at 1286.

### 3.   Roswell II

The panel hearing the appeal in <u>Roswell</u> reversed the district court, based primarily on <u>Milton</u>. <u>T-Mobile S., LLC v. City of Roswell, Ga.</u> (<u>*Roswell II*</u>), 731 F.3d 1213, 1220-21 (11th Cir. 2013). The court noted that T-Mobile had access to the same writings—a letter from the City of Roswell denying the application, minutes summarizing the city council hearing and the reasons for denial, and a verbatim transcript of the hearing—to which it had access in <u>Milton</u>. <u>Id.</u> at 1221. The court was not concerned whether it was T-Mobile or the City of Roswell that had the hearing transcribed, so long as T-Mobile had access to the transcript before filing suit. <u>Id.</u> at 1220. Though the hearing minutes were not as extensive as in <u>Milton</u>, they summarized the testimony and the reasons given by the councilmembers for their vote for denial. <u>Id.</u> at 1220. Whether the councilmember's comments were impromptu, pre-written, meritorious, or ineloquent did not affect whether the "in writing" requirement had been satisfied, so long as the reasons for the denial could be gleaned from the record. <u>Id.</u> at 1221. The Eleventh Circuit therefore remanded the case to the district court for consideration of the merits. <u>Id.</u>

### 4.   Roswell III

Before the district court reached the merits, however, the U.S. Supreme Court granted T-Mobile's petition for writ of <u>certiorari</u> to resolve the split among the circuits. The Supreme Court appears to have unanimously resolved the split in favor of the Eleventh Circuit's reading of the "in writing" requirement, but with an additional timing element not strictly found in the text of the Act. <u>Roswell III</u>, 135 S. Ct. at 811-

12. The Court rejected the majority view that the reasons for denial must be stated in the denial letter or notice itself, finding that the City of Roswell's detailed minutes were acceptable.[9] <u>Id.</u> at 818.

> We hold that localities must provide or make available their reasons, but that those reasons need not appear in the written denial letter or notice provided by the locality. Instead, the locality's reasons may appear in some other written record so long as the reasons are sufficiently clear *and are provided or made accessible to the applicant essentially contemporaneously with the written denial letter or notice.*

<u>Id.</u> at 811-12 (emphasis added). Because the City of Roswell had issued its detailed minutes twenty-six days after its written denial letter, or four days before the deadline for T-Mobile to file suit, the city had not provided its written reasons for denial essentially contemporaneous with the denial. <u>Id.</u> at 818.

The Court reached this conclusion by first reading the language of the Act, particularly "substantial evidence," a term of art in administrative proceedings, to mean that localities must provide reasons for denials of cell tower applications. <u>Id.</u> at 815. "[H]owever, these reasons need not be elaborate or even sophisticated, but rather, as discussed below, simply clear enough to enable judicial review." <u>Id.</u> The statutory text, however, does not require those reasons to be stated in the same writing that conveys the denial. <u>Id.</u> at 815-16. No particular format for the written reasons must be followed, and localities may rely on detailed meeting minutes to supply the reasons, though the Court did highlight the practical benefits of issuing a separate statement

---

[9] In a footnote, the Court indicated that the meeting transcript would not count towards satisfying the "in writing" requirement because T-Mobile, not the city, had arranged for the meeting to be transcribed. <u>Id.</u> at 818 n.7.

of reasons rather than relying on a voluminous record. Id. at 816.

But because an applicant has only thirty days after denial to seek judicial review under the Act, the locality must issue its reasons "at essentially the same time as it communicates its denial" so as to not impair either the applicant's decision to file suit or the court's subsequent review, or to allow the locality to "sandbag" the applicant with post hoc rationalizations only after suit has been filed. Id. "[G]iven the range of ways in which localities can provide their reasons" and the Act's requirement that localities need only act on applications "within a reasonable time," the Court felt the "essentially contemporaneously" requirement should not be hard to follow. Id. at 817. The Court did not decide, however, what an appropriate remedy would be for violating this requirement or whether the principle of harmless error would apply.[10] Id. at 819. As of the date of this Order, these issues, as well as the merits of the case are being briefed in the district court. T-Mobile S., LLC v. City of Roswell, Ga., No. 12-12250 (11th Cir. Mar. 2, 2015); T-Mobile S., LLC v. City of Roswell, Ga., No. 1:10-cv-1464-AT (N.D. Ga. Apr. 1, 2015).

A dissent authored by Chief Justice Roberts and joined by Justices Ginsburg and Thomas[11] charged the majority with making up a rule found nowhere in the text

---

[10] Justice Alito stressed these two points in a short concurrence, noting that T-Mobile's active participation in the approval process likely meant it sustained little prejudice from the delay and that such a delay would not necessarily mean a locality's denial must be overturned. Id. He also emphasized his understanding that "[n]othing in this statute imposes an opinion-writing requirement." Id.

[11] Justice Thomas also issued a short dissent expressing concern that, by imposing a timing requirement, the Court had not afforded the authority of municipalities due respect. Id. at 823-24.

of the Act based on an inaccurate assessment of the supposed prejudice a cell service provider[12] and a reviewing court might suffer from a locality's delay in issuing reasons for denial. Id. at 820, 822-23.

### 5. **Application to This Case**

This Court determines that the City has met the "in writing" requirement of the Act. The Commission unanimously voted to deny PI Telecom's application on June 19, 2014 and issued its final order effective the same day. The City did not issue a blanket denial order, but identified the reasons for denial as that "[t]he proposed tower does not comply with the tower siting and design standards and performance standards of Chapter 656, Part 15, Subpart A, *Ordinance Code*" and that "[t]he proposed tower design is not compatible with the existing contiguous uses, or zoning and is not compatible with the general character and aesthetics of the surrounding neighborhood, or area." (PC REC_0002.) Whether those reasons are supported by substantial evidence, including whether there is objective evidence of the tower's alleged negative aesthetic impact, is a separate issue that can then be determined by a review of the entire written record. The City's June 19, 2014 Order clears the fairly low hurdle of the "in writing" requirement.[13]

---

[12] The dissent pointed to the fact that T-Mobile ordered its own transcript to indicate how actively involved it had been in the application proceedings. Id. at 822-23. It is unclear, though, whether the dissent agreed with the majority that a transcript prepared at the applicant's instance would not satisfy a locality's requirement to provide written reasons for its denial. Id. at 822.

[13] The June 19, 2014 Order clears this hurdle despite the confusion caused by the fact that it purports to adopt and incorporate findings and recommendations from a staff report that it ultimately rejects.

To the extent that the Order might be seen as insufficient on its own, though, PI Telecom also had access to the written transcript of the Commission meeting well in advance of the deadline to seek judicial review of the City's denial.[14]  Beyond holding that a twenty-six-day delay is too long, the Supreme Court declined to put a finer point on what time period would qualify as "essentially contemporaneously" in this context. Both parties here provide dictionary definitions of the phrase that lead them to opposite conclusions as to whether six days is also too long. (Doc. 20 at 5; Doc. 21 at 4.) The Court looks primarily to the explanations the Supreme Court provided for finding that written reasons must be given essentially contemporaneously, specifically, "[b]ecause an entity may not be able to make a considered decision whether to seek judicial review without knowing the reasons for the denial of its application, and because a court cannot review the denial without knowing the locality's reasons . . . ." Roswell III, 135 S. Ct. at 816. Here, the transcript, finished an expeditious six days after the Commission meeting and issuance of the final order,

---

[14]  The City explained at the April 22 hearing that it transcribes all Commission meetings as a regular practice. Thus, the applicant need not make its own arrangements to have the meeting transcribed (though it may have to make its own arrangements to purchase a copy of the transcript from the court reporter). This case is therefore unlike Roswell III, where the Supreme Court noted that, if the applicant, not the city, arranged to transcribe the meeting, the resulting transcript would not help satisfy the "in writing" requirement. Roswell III, 135 S. Ct. at 818 n.7.

The City also volunteered at the April 22 hearing that, since Roswell III, the Commission has adopted the practice of waiting to issue a final order until the transcript is finalized and then referring to the transcript in the order, thus further obviating any concern whether the Commission's entire reasoning is made available "essentially contemporaneously."

was available for twenty-six days before PI Telecom had to file suit.[15]  PI Telecom filed

its complaint on the last day it could and attached the transcript, showing it had timely

access to the transcript and giving the Court sufficient time to review it before

reaching a decision.[16]  Thus, the Court finds that the City met the "essentially

contemporaneous" requirement. However, if it did not, any violation due to the delay

is harmless under the circumstances.[17]

## C.  Substantial Evidence of Aesthetic Impact (Count III of the Complaint)

The Court turns next to PI Telecom's claim that the Commission's denial is not

supported by substantial evidence. "[T]he 'substantial evidence' standard [under the

Act] is the traditional substantial evidence standard used by courts to review agency

decisions," meaning "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." Linet, 408 F.3d at 762 (internal citation and

quotation omitted). As such, substantial evidence is "more than a mere scintilla but

less than a preponderance." Id. (internal citation and quotation omitted). In utilizing

this standard, a court may not substitute its own judgment for that of the local

---

[15] Because the thirtieth day after the Commission Order was a Saturday, PI Telecom actually had thirty-two days in which to file suit. Fed. R. Civ. P. 6(a)(1); see 47 U.S.C. § 332(c)(7)(B)(v).

[16] PI Telecom has not explained how the verbatim Commission meeting transcript, that the City arranged for, would not satisfy the "in writing" requirement when the Supreme Court held that detailed meeting minutes would.

[17] While the Court finds no violation here, it might be preferable in the future for the Commission's final written order to contain more substantive content, particularly in those circumstances where it may be difficult to discern from the transcript which of competing reasons the Commission relied upon to deny the application or where the Commission rejected the recommendations of staff.

governing body. <u>Preferred Sites</u>, 296 F.3d at 1218. The party seeking to overturn the governing body's decision bears the burden of showing that the decision is not supported by substantial evidence. <u>American Tower LP v. City of Huntsville</u>, 295 F.3d 1203, 1207 (11th Cir. 2002). The relevant "record" within the meaning of § 332(c)(7)(B)(iii) is the "'written record of all the evidence before the governing body at the time the decision was made.'" <u>Wireless Towers, LLC v. City of Jacksonville, Fla.</u>, 712 F. Supp. 2d 1294, 1302 (M.D. Fla. 2010) (quoting <u>Vertex Development, LLC v. Marion County, Fla.</u>, No. 5:07-cv-380-Oc-10GRJ, 2008 WL 2994259, at *13 (M.D. Fla. Aug. 1, 2008) (citations omitted)).

Under the Act's substantial evidence standard, review of a local government's decision to deny a cell tower application should include consideration of the requirements of the local zoning ordinance. <u>Id.</u> at 1303 (citing <u>Wireless Towers, LLC v. St. Johns Cnty., Fla.</u>, 690 F. Supp. 2d 1282, 1294 (M.D. Fla. 2010) and <u>T-Mobile S., LLC v. Coweta Cnty., Ga.</u>, Civil Action No. 1:08-CV-0449-JOF, 2009 WL 596012, at *7 (N.D. Ga. 2009)). Thus, "[w]hen evaluating the evidence [supporting the denial], local and state zoning laws govern the weight to be given the evidence," and the Act does not "affect or encroach upon the substantive standards to be applied under established principles of state and local law." <u>Id.</u> (quoting <u>Cellular Tel. Co. v. Town of Oyster Bay</u>, 166 F.3d 490, 494 (2d Cir. 1999)). With this framework, the Court must review the Commission's subjective determination of incompatibility (based upon the factors set forth in section 656.1506 of the Tower Ordinance) for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Linet</u>, 408 F.3d at

762 (internal citation and quotation omitted). The evidentiary hurdle is a low one for the City to clear, given the discretion afforded the Commission by section 656.1506.

The City no longer contends that the proposed tower is a "low impact/stealth tower," not a "camouflaged tower," under the Tower Ordinance or that the first reason for denial given in its order—"[t]he proposed tower does not comply with the tower siting and design standards and performance standards of Chapter 656, Part 15 Subpart A, *Ordinance Code*"— is supported by substantial evidence. (Doc. 15 at 2; see PC REC_0002.) Instead, the City focuses on the second reason: "[t]he proposed tower is not compatible with the existing contiguous uses, or zoning and is not compatible with the general character and aesthetics of the surrounding neighborhood, or area." (PC REC_0002); see St. Johns Cnty., 690 F. Supp. 2d at 1293 ("[T]he Act requires only that the *adverse action* be supported by substantial evidence, not that *each individual reason* for the adverse action be supported by substantial evidence." (quotations omitted)).

The parties agree that the Eleventh Circuit recognizes that "[a]esthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the [governing body]." Preferred Sites, 296 F.3d at 1219. "[U]nder the Act the Commission is entitled to make an 'aesthetic judgment as long as the judgment is 'grounded in the specifics of the case,' and does not evince merely an aesthetic opposition to cell-phone towers in general.'" T-Mobile S. LLC, 564 F. Supp. 2d at 1346 (quoting Voice Stream PCS I, LLC v. City of Hillsboro, 301 F. Supp. 2d 1251, 1258 (D. Or. 2004)). This Court has previously reviewed the relevant Eleventh

Circuit precedent and concluded that substantial evidence sufficient to support a denial based on aesthetics must include "objective facts or evidence." Verizon Wireless Pers. Commc'ns, L.P. v. City of Jacksonville, Fla., 670 F. Supp. 2d 1330, 1341 (M.D. Fla. 2009). Requiring "objective" evidence might seem incongruous with the subjective nature of aesthetic judgments, but "before the City can deny a cell tower application based solely on aesthetic concerns such as visual impact, the Act requires that it muster some (even if not much) real evidence of that impact." Id. at 1345.

The City points to three viewsheds the Commission believed would be impacted by the proposed tower: the residences in the area, Jackson Square PUD, and Alexandria Oaks Park. (Doc. 15 at 17-18.) Section 656.1506 of the Tower Ordinance does instruct the Commission to consider compatibility "with the existing contiguous uses or zoning" and "with the general character and aesthetics of the surrounding neighborhood or area," and to pay particular attention to "the potential adverse impact" on certain places like public parks. JOC § 656.1506. The City contends that the Department staff report, photo simulations of the proposed tower, materials submitted by the developer of the Jackson Square PUD, letters from the San Marco Preservation Society and one of the City Councilmembers for the area, and the testimony at the meeting expressing concern about the tower's impact on the viewsheds constitute substantial evidence supporting the Commission's decision. (Id. at 19-22.)

PI Telecom equates the City's aesthetic rationale to nothing more than a general dislike of cell towers that is contradicted by the only objective evidence, which

proves the tower's minimal visual impact. (Doc. 14 at 14.) PI Telecom represents that it has done everything possible to ensure that the proposed tower fits with the surrounding area by picking the latest in camouflage technology, locating the tower in a railroad right-of-way on the fringe of a residential area, and testing the visual impact of the tower through expert photo simulations from around the area. (Id. at 13, 15-16.) PI Telecom argues that, with no evidence of any impact on property values or safety, the City's general aesthetic objections are insufficient to support denial. (Doc. 16 at 2.)

### 1.   <u>The Neighborhood</u>

The Court finds insufficient objective evidence in the record to support the Commission's denial based on any aesthetic impact on the viewshed from the residential area to the west of the proposed tower. PI Telecom correctly notes that, while the Tower Ordinance affords special protection to historic districts and landmarks, JOC § 656.1506(a), the evidence before the Commission was that this neighborhood has not been designated historic. Councilmember Boyer testified that the neighborhood may be eligible for historic designation, but no evidence was presented that such a designation is being considered or that the proposed tower would eliminate any eligibility to be designated historic. (PC REC_0021 at 132; PC REC_0022 at 133-34.) Neither the potential diminution in property values of homes in the neighborhood nor any safety concerns were even discussed at the meeting, let alone supported by substantial evidence. Resident Catherine Williams, who spoke in opposition to the application, focused her comments on the viability of an alternative location further south along the railroad right-of-way, and not on the impact of the

tower on views from her own home or neighborhood. (PC REC_0019 at 123-24.) Though she later answered "Yes" to a series of leading questions asking her to adopt the opinion that the tower would impact those views, there is no evidence in the record to support that opinion.[18] (PC REC_0031 at 171-72.) Instead, the only objective evidence of the tower's visual impact on the neighborhood are the photo simulations submitted by PI Telecom which show little-to-no visibility of the tower from sites within the neighborhood. (PC REC_0075, 80.) The Court does not find substantial evidence to support denial of the application based on the potential impact on viewsheds from the residential neighborhood to the west of the proposed tower.

## 2.   **Jackson Square PUD**

The viewshed from the Jackson Square PUD is a closer call. That the tower would have a visual impact on the development is established. The developer of Jackson Square estimated that the tower would be approximately 100 feet from the southwest corner of one of the four-story, mixed-commercial/residential, multi-family buildings planned for the development. (PC REC_0057; see PC REC_0021 at 129-30.) A simple look at a map shows the tower will be close to the PUD and that the view of the tower from at least some units in the PUD may be unobstructed.[19] But, as the

_____

[18] The letter and e-mail from the San Marco Preservation Society mentions the potential for the tower to be an "eyesore" for "all the users of [Alexandria Oaks] Park along with the many residents in the area," but provides no evidence of the tower's visibility from any residence. (PC REC_0064-65.)

[19] The developer of the Jackson Square PUD submitted to the Department a photo simulation he apparently commissioned to show the view of the proposed tower from the PUD. (PC REC_0047, 51, 54.) PI Telecom rightfully questions the foundation and accuracy of this simulation, which resembles a drawing of a tower literally cut and pasted on top of a photograph from the PUD without regard to scale or perspective.

Court held in <u>Verizon</u> and as the City acknowledges, concerns about proximity alone cannot support a finding of incompatibility where the proposal meets the applicable setback requirements. (Doc. 15 at 14 (citing <u>Verizon</u>, 670 F. Supp. 2d at 1343-44).) Though there was some debate at the Commission meeting, the City does not contend in its motion that the proposed tower is either located within the PUD or is too close to Jackson Square. <u>See</u> JOC § 656.1506(b)(2) (requiring camouflaged towers to be set back a distance of at least 100% of the tower height from the nearest lot line of any single-family residential property, including PUDs with a single-family residential component). Though the commissioners expressed concern about the compatibility of the proposed tower with Jackson Square and with further development in the area, aside from proximity, these concerns were largely speculative as the commissioners were presented with no objective evidence of the effect the tower would have on either. The Court concludes that there was not substantial, objective evidence to support denial of PI Telecom's application based on the proposed tower's potential aesthetic impact on the Jackson Square PUD.

### 3.   **Alexandria Oaks Park**

The same cannot be said for Alexandria Oaks Park. The Tower Ordinance makes clear that protecting the viewshed of "public parks" is a priority for the Commission in considering cell tower applications. JOC §§ 656.1501(b), .1506(a). The Department report indicates that "[t]here is a row of mature existing trees along the

---

The Court does not put much weight on this simulation, and there is no indication in the record that the Commission did either. <u>See</u> <u>Verizon</u>, 670 F. Supp. 2d at 1344.

property line which prevent[s] direct views of the tower from the park trail." (PC REC_0005-6.) But PI Telecom submitted no photo simulation of the view of the proposed tower from the open field that makes up the majority of the park.[20] The photo simulation that most closely predicts the view of the tower from the park is also the one that Muldowney, PI Telecom's consultant, acknowledged "most clearly shows the tower." (PC REC_0018 at 118.) View "I" simulates the view looking back at the tower from 993 feet to its northwest, at a location on the north edge of the park. (PC REC_0081.) Muldowney represented that, given its resemblance to a power pole (though "a lot taller"), the tower is "as slight and benign in nature visually as it possibly can be." (PC REC_0018 at 119.) That may be. But the Court cannot say from its review of the record that a "reasonable mind" would not accept View "I" as adequate support for the Commission's conclusion that the tower's visual impact is contrary to its directive to protect the viewsheds of public parks like Alexandria Oaks Park.[21] (See PC REC_0033 at 179-80 (Commissioner Day discussing View "I" and concluding "[i]n my mind, from the bigger part of the park here where it's much more wide open and

---

[20] As noted earlier, the developer of the Jackson Square PUD did submit to the Department a photo simulation from PI Telecom in which the proposed tower looms over some location in Alexandria Oaks Park. (PC REC_0047, 49.) But not only is the record unclear as to where and how the photo simulation was made, there is no indication in the meeting transcript that the Commission considered or relied upon this photo simulation in concluding that the proposed tower's impact on the Park was too great. See Verizon, 670 F. Supp. 2d at 1344.

[21] There was also evidence that the Commission felt the Garland Street location might be a better location, an appropriate consideration when evaluating aesthetic concerns. Linet, 408 F.3d at 762. The Court will address the issue of alternate sites in more detail below in its discussion of PI Telecom's prohibition of service claims.

from a closer distance, I think it's easy to assume [the tower's visual impact is] going to be more substantial").)

Documented visibility of a proposed cell tower from a public park, a space which, by ordinance, the City is trying to protect and keep pristine, rises above "mere generalized concerns regarding aesthetics." Preferred Sites, 296 F.3d at 1210. The Commission found the proposed tower's visual impact upon Alexandria Oaks Park significant enough to warrant denial of PI Telecom's application, a decision supported by photographic evidence. Faced with objective evidence of the visual impact, this Court cannot displace the Commission's "fair estimate of conflicting evidence" and cannot "freely re-weigh the evidence." American Tower, 295 F.3d at 1209 n.8. Rather, the Court can "only determine whether substantial evidence exists to support the [Commission's] decision." Id. Here, the City has "muster[ed] some (even if not much) real evidence of [visual] impact" of the tower on Alexandria Oaks Park. Verizon, 670 F. Supp. 2d at 1345. The Commission's decision that the proposed tower would have a "potential adverse impact" on Alexandria Oaks Park was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[22] Linet, 408 F.3d at 762.

---

[22] This conclusion is consistent with recent opinions from two of my colleagues in the Jacksonville Division. See, e.g., Towercom II, LLC v. City of Jacksonville, Fla., Case No. 3:14-cv-316-J-25JRK (M.D. Fla. Feb. 17, 2015) (Adams, J.); Charlie Dean Towers II, LLC v. City of Jacksonville, Fla., Case No. 3:12-cv-1067-J-39MCR (M.D. Fla. Mar. 31, 2014) (Davis, J.).

**D.    Prohibition of the Provision of Personal Wireless Services (Counts I and II of the Complaint)**

The remaining two counts of the Complaint allege that the City violated the Act by effectively "prohibiting the provision of personal wireless services" both facially through the enactment and implementation of section 656.1506(a) of the Tower Ordinance and through its application to PI Telecom through the denial of its application in this instance. (Doc. 1, ¶¶ 44-56.) PI Telecom formally abandoned its facial challenge at the April 22 hearing, but continues to press its claim that the City denied what was the least intrusive means of remedying a significant gap in service and so effectively prohibited service to the area in question. (See Doc. 14 at 18-21; Doc. 16 at 5-7.) The City responds that there was insufficient proof of a gap in service and that PI Telecom failed to explore all feasible alternative sites, like the location on Garland Street. (Doc. 15 at 22-24.)

The Act cabins the authority of states and localities to regulate "the placement, construction, and modification of personal wireless service facilities," including by providing that such regulations "shall not prohibit *or have the effect of prohibiting* the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(i)(II). The parties agree that, although the Eleventh Circuit has not yet addressed the issue, "'a locality can run afoul of the [Act]'s 'effective prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage.'" St. Johns Cnty., 690 F. Supp. 2d at 1293 n.11 (quoting Sprint PCS Assets, LLC v. City of Palos Verdes Estates, 583 F.3d 716, 726 (9th Cir. 2009) (citation and quotation omitted) and citing APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler County of Pa., 196 F.3d 469, 480 (3d Cir.

1999); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999)). "'Unlike the substantial evidence issue, the issue of whether [a locality] has prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court'" without deference to the locality's decision. T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Supervisors, 748 F.3d 185, 192 (4th Cir. 2014) (quoting Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2002) and citing VoiceStream Minneapolis, Inc. v. St. Croix Cnty., 343 F.3d 818, 833 n.6 (7th Cir. 2003)).[23]

The parties also seem to agree that it is the cell provider's burden to prove the significant gap in service and to make some showing regarding the infeasibility of alternatives to the proposal rejected by the locality, but disagree as to what the required showing is. (Doc. 15 at 16; Doc. 16 at 6.) PI Telecom suggests the Court follow the Sixth Circuit and require it to demonstrate only that the proposed tower is the "'least intrusive' means of remedying the gap in whole or in part." (Doc. 14 at 18 (citing T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield, 691 F.3d 794, 806-08 (6th Cir. 2012)).) The City cites an opinion from the District of Oregon (which in turn cites an opinion from the First Circuit) for the proposition that PI Telecom must demonstrate that "'reasonable efforts'" towards locating an alternative "'are so likely to be fruitless that it is a waste of time even to try.'" (Doc. 15 at 23 (quoting Voice Stream PCS I, LLC

---

[23] Because the Court's review on this point is de novo, PI Telecom was not restricted to the evidence before the Commission and could have sought to introduce additional evidence to the Court. Second Generation Props., L.P., 313 F.3d at 629. However, it chose not to do so.

v. City of Hillsboro, 301 F. Supp. 2d 1251, 1261 (D. Ore. 2004)).) The Court's own research has revealed cases holding that the cell provider must show that its proposal is the "only feasible plan." See Omnipoint Holding, Inc. v. City of Cranston, 586 F. 3d 38, 50-51 (1st Cir. 2009) (discussing different articulations of the test for alternatives). As the First Circuit noted in Omnipoint, "[i]t is unclear how much these different articulations of the test truly differ." Id. at 50. We need not find out here because, for the reasons discussed below, the Court concludes that PI Telecom has not met any of them. The Court turns to the first step in the analysis: whether PI Telecom has demonstrated that its proposal would remedy a significant gap in service.

### 1.    "Significant Gap" in Service

PI Telecom points to evidence in the record that it contends shows several blocks of the San Marco neighborhood where commercial and residential customers have poor voice and data coverage that impairs their ability to make calls, including emergency 911 calls. (Doc. 14 at 3, 19.) PI Telecom notes that no one, including those at the meeting opposed to the proposal, has submitted any contradictory evidence. (Id. at 19.)

The City objects to characterizing the purpose of the proposed tower as fixing a "void in coverage" rather than as *improving* in-building service to an area that already has coverage. (Doc. 15 at 23.) The City contends that denial of an application designed to patch small areas of less-than-ideal service does not amount to a prohibition of wireless service in those areas. (Id. at 23-24.)

Though it is not extremely well-detailed in the record, the Court is willing to assume for purposes of this Order only that PI Telecom has shown a significant gap in

service.[24]  The record includes a one-page letter of need from AT&T's RF system design engineer and "before" and "after" coverage maps showing the existing service and the projected service after construction of the proposed tower. (PC REC_0072, 85-86.) Muldowney summarized the issue at the Commission meeting as a problem with "in-building service to this residential portion of the city." (PC REC_0017 at 115.) The letter of need explains that homes and businesses in the large area depicted in yellow on the "before" map currently have "weak or no service conditions."[25]  (PC REC_0072.) The RF engineer reached this conclusion based on a review of the current cell sites in Jacksonville and conducting field visits and computer modeling. (Id.) He opines in the letter that "the existing coverage levels do not adequately support the usage demands of AT&T customers in this area, in terms of placing calls and using advanced data devices such as smartphones, tablets etc." (Id.) The "after" coverage map projects that the tower would eliminate much of the yellow area and result in "much improved service," including for E-911 accuracy and the provision of "Gold level services and features" to the area. (PC REC_0071-72, 86.)

The City suggests that small "dead spots" where in-building coverage is less

---

[24] However, PI Telecom overstates the evidence of the service gap, suggesting there were actual customer complaints and that callers in the area could not reach emergency 911, though that is not *exactly* the evidence presented to the Commission. (Compare Doc. 14 at 3, with PC REC_0030 at 167; and PC REC_0072.)

[25] The maps include a legend for labeling areas by colors indicating signal strength. (PC REC_0085-86.) Yellow is labeled "Best Signal Level (dBm)>=90" and comes after pink and before green, light blue, and blue. Other than by implication, though, it is not completely clear how those signal levels translate into service levels in a particular colored area.

than ideal cannot constitute a significant gap. (Doc. 15 at 23.) However, the Court is persuaded by the authority cited by PI Telecom that a lack of in-building coverage can constitute a gap in service, particularly in a primarily residential area where calls may most likely be made indoors. (Doc. 14 at 19 (citing T-Mobile Ne. LLC v. City of Lowell, Mass., Civil Action No. 11-11551-NMG, 2012 WL 6681890, at *10 (D. Mass. Nov. 27, 2012); T-Mobile W. Corp. v. City of Agoura Hills, No. CV 09-9077 DSF (PJWx), 2010 WL 5313398, at *9 (C.D. Cal. Dec. 20, 2010); T-Mobile Cent. LLC v. United Gov't of Wyandotte Cnty./Kansas City, Kan., 528 F. Supp. 2d 1128, 1168-70 (D. Kan. 2007); MetroPCS Inc. v. City & Cnty. of San Francisco, No. C 02-3443 PJH, 2006 WL 1699580, at *10-11 (N.D. Cal. Jun. 16, 2006)). Moreover, the area of weak or no service in this case extends over several blocks, which the Court does not view as an isolated dead spot. The Court is therefore willing to assume that the proposed tower addresses a significant gap in service.[26]

## 2.   **Alternatives to PI Telecom's Proposal**

PI Telecom has not demonstrated, however, that it adequately explored alternative sites to remedy the service gap, regardless of which test is employed. In selecting the design for the tower, PI Telecom did pursue the least intrusive design possible that would still serve its purposes. The proposed unipole design qualifies as a "camouflaged tower" under the Tower Ordinance, JOC § 656.1502, resembling a utility pole and hiding its antennas behind a visually-opaque but RF-transparent screen that

---

[26] The Court also assumes that PI Telecom has adequately demonstrated that the proposed tower has to be located in the search ring to remedy the significant gap in service.

carries the width of the lower monopole steel section all the way to the top of the pole. (PC REC_0018 at 117; PC REC_0026 at 149.) The proposed design exceeds the Tower Ordinance's collocation requirements for camouflaged towers in excess of 110 feet in height by accommodating a total of five carriers. (PC REC_0005); see JOC § 656.1506(c)(4). Muldowney described the design as "the latest in camouflage technology" and one preferred by the Planning Department. (PC REC_0018 at 117.) He was also open to using a camouflaged pine tree design, though no one on the Commission took him up on that offer. (Id. at 118.) Muldowney agreed that, standing 150 feet tall, the proposed tower would be much taller than a utility pole. (Id. at 119.) But there is no maximum height under the ordinance for Track II camouflaged towers, "so long as the proposed tower is architecturally and aesthetically compatible with the surrounding community." JOC § 656.1506(b)(1). As discussed above, the Commission had reason to find that the proposed tower was not compatible. But the evidence in the record is that the antennas need to be placed at 140 feet to resolve the service gap. (PC REC_0028 at 157-59; PC REC_0071, 85-86; see PC REC_0005.) So the evidence supports the conclusion that PI Telecom did seek the least intrusive tower design that would remedy the identified service gap.

However, the evidence does not support PI Telecom's conclusion that it fully considered alternative sites and found none that would be feasible. PI Telecom did look for existing towers on which to collocate and other existing tall structures on which to place antennas, but found no suitable options within the search ring. (PC REC_0071.) Thus, PI Telecom would have to place a new tower to resolve the service

gap. But when it came to finding a location for a new tower, Muldowney candidly acknowledged during the Commission meeting that PI Telecom only looked at sites within the Florida East Coast Railway right-of-way because PI Telecom has a statewide agreement with the railroad to locate towers in the right-of-way. (PC REC_0030 at 167-68.) He admitted that, as a result, PI Telecom was not aware of the Garland Street location and had not considered it before it was suggested as an alternative site at the meeting. (Id. at 162, 168.) As he put it, "the problem is [the Garland Street location] is not property owned or controlled by us." [27] (Id.; PC REC_0031 at 169.)

The Garland Street location was the subject of much inquiry during the Commission meeting.[28] Muldowney acknowledged that the Garland Street location is within the search ring and would meet AT&T's coverage objectives. (PC REC_0029 at 162; PC REC_0030 at 168.) The evidence presented was that PI Telecom could select any location within a 0.252-mile radius from the center of the search ring without needing further approval from AT&T. (PC REC_0071, 88; see PC REC_0030 at 165-68.) Muldowney explained that, in terms of finding a site that meets AT&T's coverage objectives, "[t]hey'd prefer to be closer to the middle, but they did say if I can get within that quarter mile ring, then I'm good." (PC REC_0030 at 168.) PI Telecom's contention

---

[27] There was nothing wrong with PI Telecom trying to site the tower on property it controlled, just not to the exclusion of considering other alternatives.

[28] Another alternative location further south along the right-of-way was also suggested during the meeting (PC REC_0019 at 123-24), but would be outside the search ring (PC REC_0088).

that locating at Garland Street would have a "cascading effect on the cellular network, making it necessary to erect more towers to remedy the gap" (Doc. 14 at 20-21) is flatly contradicted by Muldowney's testimony that the search ring was developed based on the idea that "if I can get this – a tower anywhere within this ring, it's going to meet that objective and it's not going to split the ring where I need a second tower to help with that coverage" (PC REC_0030 at 166).[29] Locating at Garland Street may still leave a small gap in coverage, possibly larger than the gap left by locating at the proposed site, but implicit in the search ring concept is the conclusion that any remaining gap would be acceptable to AT&T. PI Telecom's objections to Garland Street on a coverage basis are not supported by the evidence.

The other objections to Garland Street are, on this record, speculation. The Garland Street location is on a City-owned right-of-way, and the City regularly leases its rights-of-way for public service-type uses. (PC REC_0029 at 163.) PI Telecom contends the site does not have enough physical space for the tower and support facilities, but cites only to statements from Muldowney expressing concerns about room on the site due to size and other blockages but no real support for them. (Doc. 14

---

[29] PI Telecom noted during the April 22 hearing that Muldowney is not an RF engineer, presumably in an attempt to undercut statements like the above. This is inconsistent with PI Telecom's citation to Muldowney's testimony in support of the alleged cascading effect that would happen from locating at Garland Street and to help establish the coverage gap in the first place. (See Doc. 14 at 20; Doc. 16 at 5-6.) Muldowney has twenty-one years of surveying and engineering experience in the telecommunications industry and has been involved in over 1400 telecommunications sites. (PC REC_0016 at 112.) He is PI Telecom's consultant on the project and can be expected to know AT&T's objectives on the project.

at 21 (citing PC REC_0029 at 163).) It may very well be that the Garland Street location cannot physically fit the tower and its accoutrements or meet the siting requirements of the Tower Ordinance.[30] But an on-the-fly assessment of an at-least-technically-viable alternative, made within minutes of first hearing about it and without any real evaluation of the site, is insufficient to demonstrate either that PI Telecom's preferred site is the "least intrusive' means of remedying the gap in whole or in part," <u>T-Mobile Central</u>, 691 F.3d at 806-08, or that further consideration of this or other alternatives is "'so likely to be fruitless that it is a waste of time even to try,'" <u>Voice Stream</u>, 301 F. Supp. 2d at 1261.

## IV.   CONCLUSION

This Court has previously recognized the difficulties faced by an applicant in attempting to meet an aesthetic standard that is inherently subjective and on which opinions can differ dramatically. But local zoning and land use bodies are routinely called upon to make such subjective determinations. Here, the Commission's subjective concern about the "potential adverse impact" of the proposed tower on viewsheds from Alexandria Oaks Park was based on objective photographic and other evidence that the tower would visually intrude on the park. The Commission rightfully considered a potential alternative location that, until the meeting, had not been

---

[30] PI Telecom indicated as an aside during the April 22 hearing that it has since evaluated the Garland Street location and found obstructions that make it unsuitable. Of course, this information, volunteered in response to the Court's inquiry as to whether the case could be settled, was not presented to the Commission at the time it made its decision. Moreover, PI Telecom has not sought to supplement the record before this Court with evidence in support of its representation.

considered at all.[31]  The Commission then adequately documented its decision to deny PI Telecom's application. In this circumstance, the Federal Telecommunications Act was not violated by that decision.

Accordingly, it is hereby

**ORDERED:**

1.     PI Telecom's Motion for Summary Judgment (Doc. 14) is **DENIED**.

2.     City of Jacksonville's Combined Cross Motion for Final Summary Judgment (Doc. 15) is **GRANTED**.

3.     The Clerk shall enter judgment in favor of the City and against PI Telecom, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 8th day of May, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies to:

Counsel of record

---

[31]  While the record seems to show that PI Telecom knew of some opposition to its application, it may have been surprised by the level of opposition expressed during the Commission meeting, given the Department's recommendation of approval. The Court assumes that the Commission would have entertained postponing consideration of the application if PI Telecom had asked for more time to prepare and review the points made in opposition, such as the feasibility of the Garland Street location.